**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CR. NO. 21-CR-231 (RBW)** |
| **KATHERINE EMMA ROSS** | ) | |
| | ) | |

**MEMORANDUM IN AID OF SENTENCING**

**"[S]imply punishing the broken--walking away from them or hiding them from sight--only ensures that they remain broken and we do, too. There is no wholeness outside of our reciprocal humanity."**

Bryan Stevenson, Just Mercy: A Story of Justice and Redemption

In her letter to this Honorable Court, Katherine Ross's mother writes about her Christian faith.  There is no doubt that she is aware of the following story from the Bible about the little girl who Jesus raised from the dead:

> He went in and said to them, "Why all this commotion and wailing? The child is not dead but asleep." But they laughed at him. After he put them all out, he took the child's father and mother and the disciples who were with him, and went in where the child was. He took her by the hand and said to her, "Talitha koum!" (which means "Little girl, I say to you, get up!"). Immediately the girl stood up and began to walk around (she was twelve years old). At this they were completely astonished.
> Mark 5:39-42 (NIV)

Katherine's mother wants the Court to know that her little girl is not dead.  She can still get up and "can start over."

At twelve years old, Katherine was living a normal American life, untouched by violence, heartbreak, and tragedy.  Her mother reports that Katherine was a happy child, who loved to read and would spend evenings reading book after book.  Her parents were divorced and she lived with her mom, but she saw her father frequently.  At the beginning of her teenage years, ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████

By 19 years old, ████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████████,

and abuse from her boyfriend.  In 2017, her boyfriend tragically died in a car accident.  His death took a toll on her mental health, which led to ████████████████████

Despite these struggles, Katherine continued to push herself, and obtained an Associate's Degree in Paralegal Studies.  She loves the law and loves helping people.  Katherine began working an office manager and paralegal at the Victim-Law Firm in Washington, DC, owned by Person A. ████████████████████████████.  Katherine confessed to Person A that she had been taking money from his firm.  She was immediately terminated and cooperated with law enforcement in investigating the case.

In *Just Mercy: A Story of Justice and Redemption*, Bryan Stevenson stated, "[e]ach of us is more than the worst thing we've ever done."  The § 3553(a) factors recognize this because it requires the Court to examine the history and characteristics of the defendant.  While the U.S. Sentencing Guidelines recommend a certain sentence based on criminal history and offense level, courts have in most cases given lower than guideline sentences in fraud cases.  Those defendants were more than the offenses they committed.  The offense did not end the story for them.  Katherine's offense does not end the story for her.  Depression, drugs, disconnection and death do not have a permanent end to her story.  Her character shows that she can persevere.  With treatment and resources, Katherine can "get up" and get on the right path.

Katherine Emma Ross, through undersigned counsel, hereby respectfully submits this Sentencing Memorandum in anticipation of her sentencing.  Based on the nature and circumstances of the offense, her background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of 12 months and 1 day, which is fair and reasonable.

## Case Background

On March 18, 2021, an Information was filed against Ms. Ross, charging her with one count of Bank Fraud, in violation of 18 U.S.C. §§ 1344 (1) and (2).  Two weeks later, she pled guilty to the Information.  Ms. Ross accepts responsibility for the offense and did not put the government to its burden of proof at trial.

## Sentencing Law

### 1.  History – From unfettered discretion to Guideline bound.

For 200 years, federal judges had wide discretion when it came to sentencing and could sentence how they saw fit and "there was virtually no appellate review of the trial judge's exercise of sentencing discretion."[1]  Former federal judge, Marvin E. Frankel was the "most influential critic[] of indeterminate federal sentencing" and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'"[2]  Judge Frankel called for a "Commission on Sentencing" and the enactment of laws to make guidelines that would be "binding" on federal judges.[3]  Congress answered Judge Frankel's call and in 1984 the Sentencing Commission was born.  For decades, the U.S. Sentencing Guidelines were binding.

The era of binding guidelines ended sixteen years ago, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively ***advisory.***" *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added).  Under *Booker*, the

---

[1] Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993).
[2] *Id.* at 228.
[3] *Id.* at 228.

"district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).   Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added).

## 2.  The Sentencing Guidelines are *only one factor*, thus Courts must not anchor themselves to the Guidelines.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically

6

reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside

of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further

shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By

considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a),

"the sentencing court subjects the defendant's sentence to the thorough adversarial testing

contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.

It is critical for sentencing courts to consider all sentencing factors and to not give undue

weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t

has been uniform and constant in the federal judicial tradition for the sentencing judge to consider

every convicted person as an individual and every case as a unique study in the human failings

that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552

U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v.

Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if

judges are not careful, a rote application of the Guidelines can turn what is often a life-defining

moment for the defendant into a check-the-box, formulaic calculation devoid of the

individualized sentencing we strive for.").

Overall, judges are encouraged to resist "anchoring" the sentence on the guideline

numbers. "Anchoring is a cognitive bias that describes the human tendency to adjust judgments

or assessments higher or lower based on previously disclosed external information - the 'anchor.'

Studies demonstrate 'that decisionmakers tend to focus their attention on the anchor value and to

adjust insufficiently to account for new information.'" Mark W. Bennett, *Confronting Cognitive

"Anchoring Effect" and "Blind Sot" Biases in Federal Sentencing: A Modest Solution for

Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 495 (2014) (citations

omitted).

>It is important to distinguish the guidelines' intended, salutary effect - promoting consistency and proportionality in sentencing - from the unintended anchoring effect that the guidelines can exert. … Anchoring leads to cognitive error not insofar as judges intentionally use the guidelines in an advisory fashion, but instead when judges irrationally assign too much weight to the guidelines range, just because it offers some initial numbers.

*Id.* at 524 (inner quotation marks and citation omitted); *see also United States v. Docampo*, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009) (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis").

Another reason to resist anchoring a sentence to the Guidelines is that the guidelines are not always based on empirical data. "A district court may deviate from a sentencing guideline where empirical data shows that adherence to it would yield a sentence that is 'greater than necessary.'" *United States v. Price*, 649 F.3d 857, 860 (8th Cir. 2011) (quoting *Kimbrough v. United States*, 552 U.S. 85, 109-10, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007)).

## <u>Argument</u>

For the following reasons, a sentence of 12 months and 1 day is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing.

## I.    The Nature and Circumstances of the Offense[4]

On or about August 2016 to May 2017, Ms. Ross worked for the Victim-Law Firm, as an office manager and paralegal. She left in May to pursue another position, but was asked to return when other employees of the firm left. She continued to work there until June 2020. She worked as an independent contractor and received 1099s, which were provided to the defense in discovery. On or about June 26, 2020, Katherine Ross confessed to Person A that she embezzled

---

[4] The defense plans to supplement this section with a psychologist report, which is forthcoming.

8

thousands of dollars from his firm accounts by writing checks on her behalf.  The accounts were the Victim-Firm trust, operating, and business accounts.  Ms. Ross wrote several checks to herself as "compensation" which were not legitimate compensation.  She also cashed checks payable to herself that included "Cash for [Person A]" in the description line.  While certain of those checks were in fact cashed for Person A, after Person A authorized those transactions out of the Victim-Firm accounts and were delivered to Person A, most of the checks were not authorized.

In an October 8, 2020, interview with law enforcement agents, Ross admitted that she embezzled funds from the Victim-Law-Firm and Person A.  Person A suffered a significant financial hardship because of Ross' embezzlement scheme. The parties stipulate that Ross stole at least $320,000 from the Victim-Law-Firm and Person A through these various means.

Ms. Ross has accepted responsibility by not only confessing to Person A what she had done, but also by admitting her actions to law enforcement and taking steps to pay Person A back.  She understands his frustration and anger and is very remorseful for the hurt and pain that she has caused him.

## II.    Ms. Ross's History and Characteristics[5]

Ms. Ross was born in ████████████████.  She lived in Wisconsin, until she turned one, when her family moved to Virginia in 1992.  Years later, her parents divorced when she was five years old.  She began living with her stepfather, her older brother, and her mother when she was 6 years old.  Katherine has two younger sisters who are 17 and 13 years old.

---

[5] ████████████████████████████████████████████████████████████████.

Katherine "was a happy child and did well in school."[6]  She loves her family dearly.  Her stepfather describes how Katherine would watch her younger sisters while he and her mother went to work – "She took good care of them and made sure they went to the park and the pool. She had an evening job and school at the time also."[7]  She has flown to Wisconsin to help her grandmother when she was ill.   Her two best friends describe her as someone who would do anything to help[8] and stood up for what was right.[9]

Her family and friends describe how Katherine loves to work.  Her mother Sally said

My favorite quality that Katherine has is that she loves to work. She has never been a lazy person. She got her first job at 14 and has had a job ever since. Work is like therapy for her. She takes great pride in being a hard worker. I think she would have gone far and been in a top position ███████████████████████████ ████████████████████████████████



Exhibit 1, p.2.  Her stepfather explains that ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████ "For such a hard-working person with a bright future ahead of her, she could have made a great attorney- her legal writing and research is better here than all the attorneys and Law Clerks at the firm."[10]

Ms. Ross has continued to work during the pendency of this case.  ████████████████

██████████████████████████████████████████████████████████

---

[6] Letter from mother, Sally ████████ (Exhibit 1).
[7] Letter from stepfather, ████████████ (Exhibit 2).
[8] Letter from █████████████ (Exhibit 3).
[9] Letter from █████████████ (Exhibit 4).
[10] Letter from ██████████████████ (Exhibit 5).

███████████████████████████████████████████████████

████████████



████████ .

      Similarly, ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ █ ██████████████████

████████████████████████████████████████████████

████████████████

      Her family and friends discuss how intelligent Katherine is.  Her mom explained that as a child she did well in school.  Her stepfather stated that she was a hard worker and managed work and school.  Her school transcripts show several excellent scores in U.S. History, Computer Applications, Real Estate Law, Estate Planning, Business Law, Torts, and Legal Writing to name a few. [12] ██████████████████████████████████████████████

██████████████████████ [13]

████████████████████████████████████████████████

████████████████████████████████████████████████

[11] Letter from ██████████████ (Exhibit 6).
[12] ██████████████████████████ Transcript (Exhibit 7).
[13] Exhibit 4.





Katherine's brother, ███, works in the area of chemistry and medical diagnostics. █

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████"[19]

## III.    The Purpose of Sentencing Will be Accomplished with a Sentence of 12 Months and 1 Day.

The Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553 (a).

### A.    The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

---

[18] Id. at 14.
[19] Letter from brother, Matthew Ross (Exhibit 8).

To determine a just punishment for Ms. Ross, the Court must consider how she will serve her time.  Since the beginning of the COVID-19 pandemic, inmates have served time under harsher conditions – movement is limited, visits were suspended, and clients have been detained in the cells for a large majority of the day.  While the Bureau of Prisons has gone through several phases to modify restrictions on inmates, social visits are limited to maintain safety, and "[i]nmate movement in small numbers is authorized for…showers three times each week."[20] Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 240 inmates have died from COVID-19.[21]  With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

### B.  The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant."  The public will be protected while Ms. Ross serves the requested sentence.  The instant offense involved Ms. Ross's conduct with her former employer, Person A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, after Ms. Ross completes her sentence, she will be subject to supervision, which will further deter criminal conduct.

---

[20] *See* Fed. Bureau of Prisons, *BOP Modified Operations* (Updated Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed December 4, 2020).
[21] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed July 27, 2021).

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).  With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.  Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").  No further incarceration is needed to deter criminal conduct in this case.

**C.    The Requested Sentence Would Provide Ms. Ross with the Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner.**

Under 18 U.S.C. § 3553(a)(2)(D) this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed. . . medical care. . . in the most effective manner." ███████████████████████████████████████████

████████████████    The BOP notes that programing is only being offered "to the extent practicable" and that "[i]nstitutions with active COVID-19 cases may make exceptions to these programming requirements for the safety of inmates and staff." [22] Undoubtedly, because of the

---

[22] *See* Fed. Bureau of Prisons, *BOP Modified Operations* (Updated Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed December 4, 2020).

pandemic, the conditions an inmate serves under now are harsher than they were before the

pandemic. ████████████████████████████████████

██████████████████████████████.

## IV.     A 12 Month and 1 Day Sentence Properly Reflects § 3553(a) Considerations and Adheres to the Principle that this Court May Not Presume that a Guideline Sentence Is Reasonable.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among

several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85,

90 (2007).  As stated above, courts should resist anchoring a sentence to the guideline numbers.

*See Docampo*, 573 F.3d at 1105 n.5 (Barkett, J., concurring and dissenting) ("Not only have

district courts now become used to relying on [the Guidelines], but the Guidelines inevitably

have a considerable anchoring effect on a district court's analysis").  Because the Guidelines

merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve

§ 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized

sentence that actually does achieve § 3553(a)'s objectives in the case before it.  *Rita*, 551 U.S. at

348, 350.  This Court may not presume that a Guideline sentence is reasonable and should,

instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a)

considerations and whether "the case warrants a different sentence regardless." *Id.* at 351.

Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand,"

regardless of the guidelines range.  *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th

Cir. 2014) (Gorsuch, J.).  Last year, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward

without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. **Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.**

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

### A.  Defense Request for A Variance



Regarding the two-level enhancement in paragraphs 48 and 50, the defense objected to the enhancement because Ms. Ross was not under a criminal justice sentence.  See PSR, p. 36. The Probation Office cites a Fourth Circuit opinion in 2018 for support, titled *United States v. Brown.*  Id.[24]  *United States v. Brown*, 909 F.3d 698 (4th Cir. 2018) is not applicable.  In *Brown*, the defendant was "under a ten-year period of good behavior arising from his state court conviction."  909 F.3d at 700.  Here, Ms. Ross was not actually under supervision and instead given a fine.  This case is more akin to *United States v. Spikes*, 543 F.3d 1021 (8th Cir. 2008), where the defendant received a fine after a domestic battery offense.  In *Spikes*, the district court determined that the two-level enhancement applied because the defendant did not comply with the conditions of deferred prosecution and thus the conditions were "sufficiently supervisory" for purposes of U.S.S.G § 4A1.1(d).  *Id.* at 1024.  The Eighth Circuit disagreed and determined that the defendant, in the end, had received a fine.  *Id.* at 1025.  Here, Ms. Ross was not under any form of supervision and instead needed to pay a fine to close the case.  There was no

---

[23] The Juvenile and Domestic Relations District Court, p. 9, available at http://www.courts.state.va.us/courts/jdr/jdrinfo.pdf
[24] The Probation Office did not provide a citation for this opinion.

unsupervised or supervised probation.

Furthermore, this offense should not count for any points because Ms. Ross received a fine.  Under U.S.S.G § 4A1.2(c)(1), a misdemeanor or petty offense only counts if a term or probation was imposed or a term of imprisonment was imposed.  Here, probation was not imposed and imprisonment was not imposed.  "[A] suspended sentence, standing alone without an accompanying term of probation, is not a 'criminal justice sentence,' as that term is used in § 4A1.1(d)."  *United States v. Kipp*, 10 F.3d 1463, 1467 (9th Cir. 1993).  Therefore, the two-level enhancement should not apply here.

Based on these two objections, the defense requests that the Court grant a variance and treat Ms. Ross as if she were in Criminal History Category II, based on 2 or 3 criminal history points and consider that the offense level is 30-37 months.  The defense argues that a 30-37 month sentence is still greater than necessary to comply with the purpose of sentencing in this case. ███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  In addition, a variance is further warranted because "[i]n comparison to men in prison, women in prison are more likely to report having experienced physical and/or sexual abuse as children and adults."[25]  Notably,

> Research points to a number of policies and procedures that contribute to the gender differences observed in prison population growth.  For instance, women in prison often face a greater likelihood of disciplinary action and more severe consequences for similar behavior than their male counterparts.  **Consequently, in comparison to men, women in prison may disproportionately lose good conduct credits that would reduce their sentence, causing women to spend more time behind bars.**  A 2015 psychiatric study also found that **women in prison with mental health, substance abuse, and co-occurring disorders face**

---

[25] U.S. Commission on Civil Rights, Women in Prison: Seeking Justice Behind Bars, Briefing Report before the United States Commission on Civil Rights, Feb. 2020, p.23, available at https://www.usccr.gov/pubs/2020/02-26-Women-in-Prison.pdf (last accessed on Aug. 2, 2021).

**greater hurdles acclimating to incarceration** than women without such disorders. [26]

███████████████████████████████████████████████████

████████████████████████████████

**B.  The Fraud Guidelines are not consistent with Empirical Data.**

The Supreme Court has explained that U.S. Sentencing Commission "fills an important institutional role…to 'base its determinations on empirical data and national experience.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).  However, when the Commission fails to base guidelines on empirical data and national experience, the district court may determine that a guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 110.

The fraud guidelines were "partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom."  *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

> [I]n implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, **effectively guaranteed that many such sentences would be irrational on their face.**

*Id.* (emphasis added) (sentencing defendant to 24 months incarceration where the calculated gain was $15 million.).  Here, a sentence of 33-41 months or 30-37 months, based on the loss amount would be contrary to the mandate that the Court consider the many § 3553(a) factors.  As stated above, in light of Ms. Ross confessing her crime, her history and characteristics, and her

---

[26] Id. at p.13 (emphasis added).

acceptance of responsibility, a sentence of 12 months and 1 day would comply with the purposes

of sentencing.  This sentence will allow Ms. Ross to "get up" and recover from the offense and

reenter society, as her family and friends are requesting.

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by

depriving society of the contributions of the Defendant who . . . understands the consequences of

his criminal conduct and is doing everything in his power to forge a new life."  552 U.S. at 44

(citation omitted) (quoting district court).  As a result, Ms. Ross requests a sentence of 12 months

and 1 day.  The requested sentence is not "greater than necessary," and is sufficient for the

purposes of sentencing.

## <u>Conclusion</u>

For the foregoing reasons, and for any other reasons set forth at the sentencing hearing, a

sentence 12 months and 1 day sufficiently addresses Mr. Ross's conduct as well as other factors

pursuant to 18 U.S.C. § 3553(a).

<div style="margin-left:40%">

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

</div>